*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0224a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

HENRY HODGES,

                *Petitioner-Appellant,*

     *v.*

ROLAND COLSON, Warden,

                *Respondent-Appellee.*

No. 09-5021

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 01-00624—William J. Haynes, Jr., District Judge.

Argued: June 7, 2011

Decided and Filed: August 14, 2013

Before: BATCHELDER, Chief Judge; COOK and WHITE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Kelley J. Henry, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Kelley J. Henry, Gretchen L. Swift, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. James E. Gaylord, Angele M. Gregory, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

       BATCHELDER, C.J., delivered the opinion of the court, in which COOK, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 34–42), delivered a separate opinion dissenting from Part III of the majority opinion.

---

**AMENDED OPINION**

---

ALICE M. BATCHELDER, Chief Judge. In 1992, a Tennessee jury convicted Petitioner-Appellant Henry Hodges of first-degree murder and sentenced him to death. The state courts upheld the conviction and sentence on appeal and denied Hodges's petition for post-conviction relief. Hodges then petitioned for federal habeas relief, which the district court denied. Hodges now appeals that denial to this court. For the following reasons, we AFFIRM the district court's denial of Hodges's habeas petition.

## FACTS

The Tennessee Supreme Court summarized the facts of this case as follows:

The defendant, Henry Eugene Hodges, entered a guilty plea and was convicted of premeditated first-degree murder. Thereafter, the penalty phase of the trial commenced. The State presented proof of the circumstances of the offense through the testimony of Trina Brown, the defendant's fifteen-year-old girlfriend. Brown testified that one week before the murder she and the twenty-four-year-old defendant, who were living with the defendant's brother in Smyrna, Tennessee, decided to move to Florida. To get money for the move, Hodges, a male homosexual prostitute, told Brown that he would rob and kill the next person who propositioned him. Hodges discussed with Brown how the crimes would be carried out. Hodges repeated these statements on May 14, 1990, the day of this murder.

On the night of May 14, Brown and Hodges went to Centennial Park in Nashville. When the victim, Ronald Bassett, approached, Hodges talked with him, and they left together in the victim's vehicle and went to the victim's residence at 3133A, Parthenon Avenue, across from Centennial Park. Ten or fifteen minutes later, Hodges returned to the park on foot, and along with Brown, drove back to the victim's residence in his own car. Hodges told Brown to lie down in the backseat of the car so no one could see her. When they arrived at the victim's residence, Hodges told Brown to wait in the car. After an unspecified period of time, Hodges returned to the car, wearing gloves, and asked Brown to come into the house. Brown testified that when she arrived, Bassett was lying face down on the bed in his bedroom with a pillow over his head. Hodges had bound his feet together with duct tape and had handcuffed his hands. While Bassett lay helplessly, Brown and the defendant ransacked the house searching for items of value. After obtaining the personal identification number for the victim's automatic teller card, Brown and the defendant "took a break," drank a coke, and discussed whether to kill Bassett. Brown testified that she told Hodges to kill Bassett to prevent their arrest. Hodges then went into the bedroom and, ignoring the victim's pleas

not to kill him, strangled Bassett to death with a nylon rope. Brown testified that she heard Bassett moan and make a choking sound and that it took about five minutes for Bassett to die.

In an attempt to remove any fingerprints, the defendant wiped off various items in the residence. After turning the air conditioner in Bassett's bedroom on high to prevent discovery of the body, Hodges and Brown left the victim's residence, taking the victim's automobile and several items of personal property, including jewelry, a gun, and a VCR. After using Bassett's automatic teller card to withdraw the twenty-four-hour maximum of four hundred dollars from his account, the pair returned to the house of the defendant's brother and went to bed. The next day, having learned that the victim's body had been discovered, Brown and the defendant abandoned the victim's car in rural Rutherford County and drove to Georgia in their own car. They were eventually arrested in North Carolina. Items of the victim's personal property were found in their possession at this time. Also, the defendant's fingerprints were found on items inside Bassett's home, and Brown had been photographed withdrawing money with Bassett's automatic teller card.

Testifying for the State at the sentencing hearing, Dr. Charles Harlan, the chief medical examiner for Metropolitan Nashville and Davidson County, confirmed that Bassett had died from ligature strangulation. Dr. Harlan opined that Bassett would have remained alive and conscious for at least three and perhaps as long as five minutes during the strangulation. Harlan also found abrasions on the victim's wrists consistent with handcuffs.

The State proved that the defendant had been convicted of armed robbery, attempted kidnaping and robbery in Hamilton County in 1984. The State also established that the defendant had been convicted of murder in Fulton County, Georgia, in July 1990. The record reveals that the Georgia killing occurred when the defendant and Brown arrived in Atlanta after murdering Bassett. Hodges made arrangements with a man to engage in homosexual acts for an agreed price. Hodges accompanied the man to his motel room, but when the man was unable to pay the agreed price, Hodges murdered him.

In mitigation, the defendant testified and also presented the testimony of his mother, his brothers and Dr. Barry Nurcombe, a child psychiatrist. This proof showed that the defendant was the next to youngest of his mother's five sons. His mother and father were not married. His father was actually married to another woman, but engaged in what one of the witnesses described as an "irregular union" with the defendant's mother for eighteen years. The defendant's father abused the defendant's mother and was strict with the defendant's brothers, three of whom were the children of another man. The defendant, however, was his father's favorite and was spoiled. Financial difficulties forced the family to move about frequently, and defendant's father supported the family only sporadically.

The defense introduced proof to show that Hodges seemed normal until he was twelve years old. At that time, he began to associate with older boys, sniff glue and gasoline, be truant from school, and run away from home. He also engaged in sexual activities with his younger

brother and attempted sexual activities with a female cousin. He became involved with the juvenile authorities and was confined to a juvenile facility in Chattanooga.

Through his mitigation proof, the defendant attempted to establish that a catalyst and major contributing cause of his delinquent and later criminal behavior was his rape and sexual abuse by a stranger when he was twelve years old. According to the defendant, he accepted a stranger's offer of a ride home when he was playing a short distance from his home on Fessler's Lane in Nashville. Rather than driving Hodges home, the stranger drove Hodges to his home and raped him. Fearing rejection by his homophobic father and driven by guilt, the defendant told no one of this incident until he was arrested in 1990.

Dr. Nurcombe testified that, while the defendant suffered from an antisocial personality disorder, low self-esteem, and substance (marijuana) abuse, the killing was motivated by a subconscious desire for revenge for the sexual abuse inflicted on him when he was twelve, coupled with Hodges' fear that his family might discover that he was engaged in homosexual prostitution since Brown had told Hodge's [sic] sister-in-law shortly before the killing that he was a homosexual prostitute. The defense also introduced testimony that Brown dominated and manipulated the defendant.

In rebuttal the State called Dr. James Kyser, a forensic psychiatrist, and Dr. Leonard Morgan, a clinical psychologist. Both had examined the defendant and concluded that he suffered from an antisocial personality disorder. They described persons with this disorder as having "no conscience," being "self centered," being "notoriously dishonest and untruthful," and having "very little regard for the feelings of others and . . . willing to use any means to get what they want, no matter who it hurts." While acknowledging the complicated factors involved in antisocial personality disorders, the State's experts discounted the singular importance of the one incident of alleged sexual abuse in causing the defendant's actions. Dr. Morgan concluded that the defendant "was in complete control of his behavior" and not suffering from mental illness or emotional disturbance.

Based on the evidence presented, the jury determined that the State had proven the existence of three aggravating circumstances beyond a reasonable doubt: (1) "[t]he defendant was previously convicted of one or more felonies, other than the present charge whose statutory elements involve the use of violence to the person;" (2) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (3) "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or attempting to commit, or fleeing after committing a robbery." Tenn. Code Ann. § 39–13–204(i)(2); (i)(5) and (i)(7) (1991 Repl.). In addition, the jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and, as a result, sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors alleged by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

*Tennessee v. Hodges*, 944 S.W.2d 346, 349–51 (Tenn. 1997) (footnotes omitted).

## PROCEDURAL HISTORY

Hodges was convicted of first-degree murder and sentenced to death in January 1992. The Tennessee Court of Criminal Appeals affirmed his conviction and sentence in 1995. *Tennessee v. Hodges*, No. 01-C-01-9212-CR00382, 1995 WL 301443 (Tenn. Crim. App. May 18, 1995). The Tennessee Supreme Court affirmed in 1997. *Hodges*, 944 S.W.2d 346.

Hodges filed a petition for post-conviction relief in December 1997, and the trial court denied relief in February 1999. The Tennessee Court of Criminal Appeals affirmed that decision in 2000. *Hodges v. Tennessee*, No. M1999-00516-CCA-R3-PD, 2000 WL 1562865 (Tenn. Crim. App. Oct. 20, 2000). The Tennessee Supreme Court denied an application for permission to appeal in March 2001.

Hodges filed a petition to proceed in forma pauperis in federal district court in May 2001, a provisional petition for a writ of habeas corpus in July 2001, and an amended petition in March 2002. Hodges raised 32 claims and subclaims in his amended habeas petition. The district court granted some of Hodges's discovery requests, denied others, and denied Hodges's request for an evidentiary hearing. In March 2008, the district court denied Hodges's habeas petition. Hodges applied for a Certificate of Appealability ("COA"), and the district court granted a COA as to all claims.

## STANDARD OF REVIEW

This court reviews de novo a district court's legal conclusions and mixed questions of law and fact, and reviews its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case

differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Id.* To obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

To analyze whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, courts look only to the holdings of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). Courts consider lower court decisions to the extent they shed light on the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established. *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003). Finally, the state court's factual findings are presumed correct unless rebutted by the habeas petitioner by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004).

## ANALYSIS

Before this court, Hodges raises four issues: (1) whether the state courts reasonably applied federal law in determining that certain restrictions imposed on voir dire by the trial court did not interfere with Hodges's constitutional right to a fair and impartial trial; (2) whether the district court properly denied Hodges's requests for discovery, an evidentiary hearing, and habeas relief on a claim of juror misconduct; (3) whether the state courts reasonably applied federal law in determining that Hodges's trial counsel were not ineffective for advising Hodges to plead guilty to murder and aggravated robbery; and (4) whether the district court properly denied an evidentiary hearing and habeas relief on Hodges's claims of incompetency at trial and ineffective assistance of counsel at sentencing. Hodges failed to brief the remaining claims for which the district court granted a COA and, therefore, has waived them. *See* Fed. R. App. P. 28(a)(9)(A); *Landrum v. Mitchell*, 625 F.3d 905, 913 (6th Cir. 2010).

**I.      Restrictions on Voir Dire**

Hodges alleges that he was denied his right to a fair and impartial jury when the trial court refused to allow his attorneys to ask prospective jurors whether they could consider a life sentence for a defendant with a prior conviction for murder.  Specifically, defense counsel repeatedly attempted to ask the following question or a variation thereof:  "Could you impose a life sentence for somebody who has been convicted of first degree murder twice?"  The trial court repeatedly sustained the prosecution's objections to the question.

Hodges raised this claim on direct appeal.  The Tennessee Court of Criminal Appeals rejected it, finding that each juror was asked and allowed to answer questions about whether he could follow the law, consider a life sentence, and weigh the aggravating and mitigating circumstances.  *Hodges*, 1995 WL 301443, at *8.  The court also found that a prospective juror could not answer the question "without knowing more about the facts surrounding the case," and that the question impermissibly sought "to obtain a pledge from the prospective juror."  *Id*.  The district court found that the state court's decision was not an unreasonable application of federal law, agreeing with the state appellate court that Hodges's questions improperly sought to commit the jurors to an opinion before hearing all of the evidence.

The Sixth Amendment guarantees a criminal defendant a trial by an impartial jury.  *Morgan v. Illinois*, 504 U.S. 719, 726–27 (1992).  An adequate voir dire to identify unqualified jurors is integral to that right.  *Id*. at 729; *Dennis v. Mitchell*, 354 F.3d 511, 523–24 (6th Cir. 2003).  A state court's refusal to pose "constitutionally compelled" questions merits habeas relief.  *Mu'Min v. Virginia*, 500 U.S. 415, 425–26 (1991).  Questions are constitutionally compelled only if "the trial court's failure to ask these questions . . . render[s] the defendant's trial fundamentally unfair."  *Id*.

Hodges relies primarily on *Morgan* in support of his position.  In *Morgan*, the trial court did not permit defense counsel to ask prospective jurors the following question:  "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?"  *Morgan*, 504 U.S. at 723.  The Supreme Court held that general questions about following the law were not enough and that it was error to exclude a more specific question tailored to identify jurors "who would *always* impose death following conviction [of a capital offense]."  *Id*. at 733, 735 (emphasis in original).

The Tennessee Court of Criminal Appeals' determination that the trial court's restrictions on voir dire were permissible was neither contrary to nor an unreasonable application of federal law. The trial court allowed defense counsel to ask the *Morgan* question, *i.e.*, whether there was an aggravating circumstance that would cause her automatically to impose the death penalty. In fact, the trial court went beyond that and also allowed defense counsel to ask prospective jurors whether they could impose a life sentence on a defendant who had a prior conviction for a violent felony.[1] Only when defense counsel sought to get even more specific—asking whether a prospective juror could impose a life sentence on a defendant who had a prior first-degree murder conviction—did the trial court restrict questioning.

This circuit has held that voir dire questions about how a potential juror would vote if given specific examples of aggravating or mitigating evidence are not constitutionally compelled under *Morgan*. In *Dennis*, 354 F.3d at 523, the petitioner alleged that the trial court violated his constitutional rights by refusing to permit him to ask prospective jurors about specific mitigating factors, including age, lack of prior criminal history, and environment. We held that the Ohio Supreme Court's conclusion that the trial court allowed adequate questioning was "not an unreasonable determination of the facts in light of the record" and was not "contrary to United States Supreme Court precedent." *Id*. at 525. We noted that the trial court had allowed the petitioner's counsel to ask prospective jurors about mitigating factors in general: whether or not they could consider mitigating factors and return a life sentence; whether they could follow the law; and whether any of the jury panel had strong feelings about psychological evidence concerning upbringing, discipline, and lack of discipline. *Id*. at 524–26.

Similarly, in *Bedford v. Collins*, 567 F.3d 225 (6th Cir. 2009), we rejected the petitioner's claim that the trial court improperly limited the scope of voir dire by prohibiting counsel from asking questions that

---

[1]In one instance, defense counsel asked if a prospective juror could consider mitigating evidence for a defendant who had been previously convicted of a violent felony (as opposed to a previous conviction for first-degree murder). The juror answered "[p]robably not" and was subsequently excluded for cause. Hodges claims the exclusion of this juror "proves the fundamental unfairness of the trial court's restrictions [on voir dire]." Pet.'s Br. at 69. We disagree for at least two reasons. First, the question posed to that juror contemplated a conviction for *any* violent felony, which is different from a question asking about a *specific* violent felony actually at issue in the trial (*e.g.*, first-degree murder). Second, the trial court's exclusion of that juror on the basis of her answer to that specific question does nothing whatsoever to suggest that the trial court was constitutionally compelled to allow the excluded questions, which focused on first-degree murder, not violent felonies in general. Accordingly, despite Hodges's vehement arguments to the contrary, the exclusion of that juror does not provide compelling support for his position.

sought to elicit prospective jurors' views on the petitioner's specific case. We noted that the trial court "drew the line at questions that sought to elicit the jurors' views on [the petitioner's] specific case—but many judges understandably (*and properly*) would do the same thing to prevent the lawyers from previewing their case through voir dire." *Id*. at 232 (emphasis added). Ultimately we concluded that the restrictions on voir dire "did not render the process fundamentally unfair. [The restrictions] reflect instead a reasonable effort to enable adequate exploration of juror biases (on the one hand) while preventing counsel from extracting commitments from individual jurors as to the way they would vote (on the other)." *Id*. (citing *Dennis*, 354 F.3d at 523–25).

Other circuits agree that *Morgan* does not compel a trial court to allow questions about how a potential juror would vote if given specific examples of aggravating or mitigating evidence. *See Richmond v. Polk*, 375 F.3d 309 (4th Cir. 2004); *United States v. McVeigh*, 153 F.3d 1166, 1207 (10th Cir. 1998) ("When a defendant seeks to ask a juror to speculate or precommit on how that juror might vote based on any particular facts, the question strays beyond the purpose and protection of *Morgan*."). In *Richmond*, the Fourth Circuit addressed a claim functionally identical to the one presented here by Hodges. There, the defendant sought to ask potential jurors "if . . . knowing that [the defendant] had a previous first-degree murder conviction, they could still consider mitigating circumstances . . . in determining what their ultimate recommendation as to life or death is going to be." *Richmond*, 375 F.3d at 316. The trial court denied counsel's request to ask the question "on the basis that it was a 'stakeout' question aimed at determining what prospective jurors would do if presented with a certain state of evidence." *Id*. The North Carolina Supreme Court agreed and affirmed. *Id*. at 329–30. The Fourth Circuit held that the North Carolina Supreme Court's decision "was neither contrary to nor an unreasonable application of *Morgan*." *Id*. at 330 (internal quotation marks omitted). It reasoned:

> *Morgan* does not require that a capital defendant be allowed to determine at voir dire what a prospective juror's sentencing decision will be if presented with a specific state of evidence or circumstances. Rather, *Morgan* requires that a capital defendant be afforded an adequate opportunity at voir dire to identify prospective jurors who, even prior to the State's case in chief, have predetermined to impose the death penalty.

*Id*. (internal quotation marks and formatting omitted).

We agree with the Fourth Circuit's reasoning in *Richmond*, and we hereby reaffirm our own holdings in *Dennis* and *Bedford*. Trial courts have "a great deal" of discretion in conducting voir dire. *Morgan*, 504 U.S. at 729. *Morgan* simply does not require a trial court to permit defense counsel to ask prospective jurors how they would vote assuming the existence of particular mitigating or aggravating circumstances, which is essentially what defense counsel sought to do here. *Morgan* allows for the identification and exclusion of jurors who are biased for or against the death penalty before being presented with any evidence and would *always* vote in accordance with their biases without regard to the particular facts of the particular case. *Id*. at 733 ("Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered . . . nugatory.") (emphasis in original)). When defense counsel asks questions about the specific aggravating and/or mitigating factors actually at issue in a case, defense counsel is no longer attempting to identify members of the venire who would *always* vote for the death penalty; rather, defense counsel is attempting to preview how prospective jurors will vote given the specific facts of the individual case, and *Morgan* does not require a trial court to allow such previews.

Here, defense counsel was permitted to ask the *Morgan* question and was even permitted to go beyond that and ask questions such as whether a juror could impose a life sentence on a defendant with previous violent-felony convictions. That was easily sufficient to comply with *Morgan*'s requirement that a capital defendant be allowed to identify prospective jurors who would "always" vote for death. *See id*. The trial court excluded only questions concerning specific aggravating factors actually at issue in the case (namely, a previous conviction for first-degree murder). Accordingly, the decision of the Tennessee Court of Criminal Appeals affirming the trial court's restrictions on voir dire was neither contrary to nor an unreasonable application of federal law, and Hodges is not entitled to habeas relief on this claim.

## II.     Juror Misconduct

Hodges claims that his death sentence violates his Sixth, Eighth, and Fourteenth Amendment rights because juror Leroy Thompson engaged in misconduct by allegedly misinforming the trial court that he would be able to sit on the jury but then voting for the death penalty only because he was in pain due to arthritis and wanted to end deliberations. Hodges included Thompson's alleged misconduct as a ground for

his request for an evidentiary hearing.  Hodges concedes that he never raised this matter in the state courts and that it is therefore procedurally defaulted, but he contends that he can establish cause and prejudice to excuse the procedural default.

Whether a petitioner's federal habeas claim is barred by procedural default is a question that we review de novo.[2] *Abela v. Martin*, 380 F.3d 915, 922 (6th Cir. 2004).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  When a petitioner has failed to present the grounds to the state courts and no state remedy remains available, his grounds are procedurally defaulted.  *Id.* at 847–48.  "[T]he exhaustion doctrine requires the petitioner to present the same claim under the same theory to the state courts before raising it on federal habeas review."  *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (internal quotation marks omitted).  The petitioner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims and actual prejudice to his defense at trial or on appeal.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  The only exception is if review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent.  *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986).

Hodges concedes that he never presented this particular claim to the state courts.  He did challenge Thompson for cause on the basis that Thompson was incompetent and unable to understand the proceedings, but he never "presente[ed] the same claim under the same theory to the state courts" that he presents here.  *See Hicks*, 377 F.3d at 553.

Hodges no longer has any state court remedies to exhaust.  Under Tennessee's post-conviction law, a prisoner challenging a conviction may file only one petition attacking a single judgment.  Tenn. Code Ann.

---

[2]We recognize that the district court did not discuss whether this claim was procedurally defaulted because it found that Leroy Thompson did not serve on the jury.  That finding was clearly erroneous; Leroy Thompson's name appears on the verdict form.  The district court's failure to discuss procedural default of this claim does not prohibit this court from considering it, *cf. Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000) ("we nonetheless may raise [the issue of procedural default] *sua sponte*"), particularly in light of the fact that the State argued that the claim was procedurally defaulted in both the district court and in this court.

§ 40-30-102(c). A prisoner may file a motion to reopen his first post-conviction petition only if his claim stems from a newly established constitutional right that applies retroactively, relies on scientific evidence that he is actually innocent, or involves a sentence enhanced because of a previous conviction that has been declared invalid. *Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997) (citing Tenn. Code Ann. § 40-30-217(a) (1996 Supp.)). Hodges's juror misconduct claim does not fall within any of these exceptions. Because he failed to present the claim to the state courts and no state court remedies remain available, the claim is procedurally defaulted. *See O'Sullivan*, 526 U.S. at 848.

At the district court, Hodges argued that various causes could excuse his procedural default, including ineffective assistance of appellate counsel, ineffective assistance of post-conviction counsel, reliance on Thompson's responses in voir dire, and Hodges's inability to locate Thompson before the post-conviction evidentiary hearing. Ineffective assistance of counsel can constitute cause for a procedural default. *See Carrier*, 477 U.S. at 492. However, "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In post-conviction proceedings, Hodges raised a claim of ineffective assistance of appellate counsel regarding Thompson's competence. He did not claim that appellate counsel were ineffective for failing to raise the claim that Thompson engaged in misconduct. Accordingly, Hodges cannot rely on ineffective assistance of counsel to establish cause to excuse his procedural default.

Nor can Hodges rely on ineffective assistance of post-conviction counsel to establish cause to excuse his default, even if this holding is not so clear-cut as it once would have been. Historically, the federal courts have held that there is no constitutional right to an attorney in post-conviction proceedings, and that ineffective assistance of post-conviction counsel therefore cannot establish cause for procedural default. *See Carpenter*, 529 U.S. at 450–53; *Coleman*, 501 U.S. at 752; *Landrum*, 625 F.3d at 919. But the Supreme Court recently held in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), that there is a "narrow exception" to *Coleman*: "Inadequate assistance of counsel at initial review collateral proceedings may establish cause for a procedural default of a claim of ineffective assistance *at trial*." *Id.* at 1315 (emphasis added). This "equitable"—as opposed to constitutional—exception is premised on *Coleman* itself, a case in which the Court declined to address the situation in which "state collateral review is the first place a prisoner can present a challenge to his conviction." *Coleman*, 501 U.S. at 755. The *Martinez* Court held that in such

situations ineffective assistance of post-conviction counsel may be raised as cause to excuse procedural default because "the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective assistance claim." *Martinez*, 132 S. Ct. at 1317.

The Court in *Martinez* purported to craft a narrow exception[3] to *Coleman*. We will assume that the Supreme Court meant exactly what it wrote: "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true *except* as to initial-review collateral proceedings for claims of ineffective assistance of counsel *at trial*." *Id.* at 1316 (emphasis added). The Supreme Court further insisted:

> The rule of *Coleman* governs *in all but the limited circumstances recognized here*. The holding in this case *does not concern attorney errors in other kinds of proceedings*, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons. In addition, the limited nature of the qualification to *Coleman* adopted here reflects the importance of the *right to the effective assistance of trial counsel* and Arizona's decision to bar defendants from raising ineffective-assistance claims on direct appeal. Our holding here addresses *only* the constitutional claims presented in this case, where the State barred the defendant from raising the claims on direct appeal.

*Id.* (internal citations omitted; emphases added).

We will address Hodges's claims of ineffective assistance of *trial* counsel in a different section, but here he claims ineffective assistance of post-conviction counsel as cause to excuse default of his claim of ineffective assistance of *appellate* counsel for failure to raise the juror misconduct issue on direct appeal. Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel. *See, e.g.*, *Landrum*, 625 F.3d at 919. Moreover, 28 U.S.C.

---

[3]We are reminded of one jurist's statement, made in a different context, that "[e]xceptions to categorical rules, once created, are difficult to cabin; the logic of the new rule, like water, finds its own level, and it's hard to keep it from covering far more than anticipated." *United States v. Alvarez*, 638 F.3d 666, 667 (9th Cir. 2011) (Kozinsky, C.J., concurring).

§ 2254(i) bars a claim of ineffective assistance of post-conviction counsel as a separate ground for relief, *see Martinez*, 132 S. Ct. at 1320, and Hodges has not presented any evidence to justify review of his claim in order to prevent a fundamental miscarriage of justice. *See Carrier*, 477 U.S. at 495–96.

Additionally, Hodges cannot rely on statements made by Thompson at voir dire or difficulties in locating Thompson during state post-conviction proceedings to establish cause. Thompson discussed his pain-causing arthritis at voir dire on January 27, 1992. The verdict form is dated January 30, 1992. Hodges filed his petition for state post-conviction relief on December 11, 1997. He first attempted to locate Thompson in or around June 1998. Hodges gives no explanation whatsoever as to why nearly six-and-a-half years elapsed between his conviction and his first attempt to locate Thompson. Moreover, Hodges gives no explanation as to why or how he was able to locate Thompson for the federal habeas proceeding but not for the state post-conviction proceeding.

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Carrier*, 477 U.S. at 479. For nearly six-and-a-half years, Hodges was aware that Thompson had arthritis and may have been in pain during jury deliberations but failed to seek him out. The fact that Hodges did not even attempt to locate Thompson until it was nearly too late, and then could not find him in time to present his testimony to the state court, is not an objective factor external to the defense sufficient to establish cause to excuse procedural default.

Finally, Hodges has not presented any evidence that review of this claim is necessary in order to prevent a fundamental miscarriage of justice. *See id.* at 495–96. This exception has been applied only when a habeas petitioner has demonstrated that he is actually innocent. *See Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006) (citing *Carrier*, 477 U.S. at 496). Hodges has not presented new evidence of his innocence nor has he even argued that he is actually innocent.

Accordingly, Hodges is unable to establish the cause necessary to excuse his procedural default of this claim. It was therefore appropriate for the district court to deny both an evidentiary hearing and habeas relief on this claim because the claim is barred.

**III.     Ineffective Assistance of Counsel at Plea Phase**

Hodges argues that his counsel rendered ineffective assistance by advising him to plead guilty; that because of their deficient performance, his guilty plea was neither knowing, voluntary, nor intelligent; and that he was prejudiced by his counsel's performance. Hodges claims that his lawyers mistakenly believed that his pleading guilty would prohibit the state from introducing any evidence relating to the facts of the murder; that his lawyers forgot that if he pled guilty to the aggravated robbery charge, Hodges would immediately become death eligible; and that he would not have pled guilty if his lawyers had given him accurate information.

Hodges failed to appeal the plea-invalidity claim to the Tennessee Court of Criminal Appeals, and referred to it only in the final page of his brief without citing to the record or any legal authority. The Tennessee Court of Criminal Appeals considered the issue waived and declined to address it, relying on Tenn. Crim. App. R. 10(b) and Tenn. R. App. P. 27(a)(7). *See Hodges*, 2000 WL 1562865, at *32. To the extent that it is a separate claim, the plea-invalidity claim is procedurally defaulted. *See Middlebrooks v. Bell*, 619 F.3d 526, 535–36 (6th Cir. 2010). Hodges cannot rely on ineffective assistance of post-conviction counsel to excuse the default; neither has he presented any evidence to justify review of his claim in order to prevent a fundamental miscarriage of justice. *See Carrier*, 477 U.S. at 495–96. Accordingly, the plea-invalidity claim is barred, and this court will review only the ineffective assistance of counsel claim.

Hodges raised the ineffective assistance claim in his state post-conviction petition. The trial court held an evidentiary hearing and took testimony from Hodges's trial counsel. *Hodges v. Tennessee*, No. M1999-00516-CCA-R3-PD, 2000 WL 1562865, at *18 (Tenn. Crim. App. Oct. 20, 2000). The Court of Criminal Appeals summarized the evidence presented as follows:

> At the post-conviction hearing, Dawson [defense counsel at trial] testified that the decision to enter a guilty plea was made the weekend prior to trial when it was determined that "there was no way we were going to convince anybody that Mr. Hodges didn't kill the victim in this matter." He explained that, at that time, the defense team believed that by entering a plea during the guilt phase of the trial, they would gain credibility with the jury for the sentencing phase. The defense team also hoped to surprise the State by entering the plea. In essence, the defense team intended to disrupt the bifurcated nature of the trial, thereby precluding the State from introducing evidence during the penalty phase which the State had planned to introduce at the guilt phase. Notwithstanding this reasoning, Dawson admitted that,

although the proof was overwhelming, in hindsight, they should have proceeded to trial so that they could have begun introduction of their mitigation theories. Michael Terry [defense counsel at trial] corroborated Dawson's testimony regarding the appellant's guilty plea. He explained that the plea was supposed to be "a demonstration of remorse for the jury." However, he agrees that the decision was a mistake and that they should have at a least "pitched a fight." [Hodges] did not testify at the post-conviction hearing.

*Id*. The trial court held that counsel made an informed tactical decision to advise Hodges to plead guilty. *Id*.

The Tennessee Court of Criminal Appeals affirmed that decision. It cited *Hill v. Lockhart*, 474 U.S. 52 (1985), for the proposition that the two-prong standard from *Strickland v. Washington*, 466 U.S. 668 (1984), applies to ineffective assistance of counsel claims arising out of guilty plea proceedings. *Hodges*, 2000 WL 1562865, at *19–20. The court concluded that the advice to plead guilty was not "outside the range of competence demanded of attorneys in criminal cases." *Id*. at *20. The court noted the overwhelming evidence of guilt, the reasonable hope of obtaining leniency, the reasonable belief that the jury would view the guilty plea as an expression of remorse, and the elimination of the presentation to the jury of all of the evidence available of Hodges's guilt. *Id*. at *19.

The district court held that the state court's conclusion that Hodges's counsel made a strategic decision to advise him to plead guilty was not unreasonable. The court noted that Hodges's counsel had done substantial work on the case before advising him to plead guilty; that counsel were experienced, aware of the state's proof and the elements of the offenses charged; had the aid of three experts; and were impaired by Hodges's public statements admitting to several murders. The district court also found that Hodges did not establish prejudice because Hodges did not testify at his post-conviction hearing and thus did not say that he would not have pled guilty but for the advice of counsel.

After a careful review of the record, we agree with the district court. The state court's determination that defense counsel's performance was not deficient was not contrary to or an unreasonable application of

federal law. Moreover, even if we were to find deficient performance, Hodges has failed to show that he was prejudiced by the performance.[4]

To establish ineffective assistance of trial counsel, Hodges must show that (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687–88. An attorney's performance is deficient if it is objectively unreasonable under prevailing professional norms. *Id*. at 688. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689. The test for prejudice is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id*. at 694. To show prejudice in the guilty-plea context, a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and instead would have insisted on going to trial." *Hill*, 474 U.S. at 59. "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id*.

The Supreme Court has recently noted that "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id*. (internal quotation marks and citations omitted). Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

---

[4]We note that two recent Supreme Court cases—*Lafler v. Cooper*, 132 S. Ct. 1376 (2012), and *Missouri v. Frye*, 132 S. Ct. 1399 (2012)—recognizing a Sixth Amendment right to effective representation during plea-deal negotiations are not implicated here. The record does not reflect that Hodges was offered any plea deal, so the existing legal standard under *Hill v. Lockhart*, 474 U.S. 52 (1985), and its progeny remains the law.

## A.    Performance

Using the "doubly" deferential standards of § 2254(d) and *Strickland*, we conclude that the state court's determination that defense counsel's performance was not deficient was neither contrary to nor an unreasonable application of federal law.  Trial counsel advised Hodges to plead guilty because of the overwhelming evidence of his guilt, to give the defense credibility, to limit the proof the prosecution could present, and to show Hodges's remorse.

The Supreme Court has explicitly approved using the American Bar Association ("ABA") Guidelines on attorney performance in effect at the time of a defendant's trial as "guides to determining what is reasonable" performance by counsel.  *See, e.g.*, *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010).  However, "ABA Guidelines are not 'inexorable commands'; rather, they are 'only guides to what reasonableness means, not its definition.'"  *Post v. Bradshaw*, 621 F.3d 406, 418 (6th Cir. 2010) (quoting *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009)) (some internal quotation marks omitted).

The ABA Guidelines in effect at the time of Hodges's trial contemplated negotiated guilty pleas only where the defendant is assured of a sentence less than death.  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"), § 11.6.1 (1989).  "If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights."  *Id*. § 11.6.3 cmt.

Courts also find that a defendant has little to gain from pleading guilty in a capital case, even when the evidence of guilt is overwhelming.  "[P]leading guilty [in a capital case] without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant."  *Florida v. Nixon*, 543 U.S. 175, 191 n.6 (2004) (citing ABA Guidelines § 10.9.2 cmt. (rev.ed. 2003)).  The *Nixon* Court noted that pleading guilty "increases the likelihood that the State will introduce aggressive evidence of guilt during the sentencing phase, so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence."  *Id*.  Nevertheless, the Court concluded that "counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade."  *Id*. at 192 (internal quotation marks omitted).

This court has also recently decided a similar, but distinguishable, case. In *Post*, 621 F.3d at 415–18, a pre-*Richter* case, we addressed whether trial counsel's advice to enter a no-contest plea and to submit the penalty phase to a three-judge panel rather than a jury was objectively reasonable under *Strickland*. Using de novo review, we concluded that the defendant's weak mitigation case made the decision reasonable, noting that "[the defendant's] counsel were between a rock and a hard place in determining the best way to spare him a death sentence, given the overwhelming evidence of his guilt, his numerous confessions, and his refusal to plead guilty." *Id.* at 418. We held that although the no-contest plea resulted in the defendant's being "sentenced by judges, not jurors, and by three persons rather than twelve," the strategy was professionally reasonable because the sentencing judges could have viewed the no-contest plea as a mitigating factor (although ultimately they did not). *Id.* at 417.

Trial counsel's advice to plead guilty here was questionable. Defense counsel hoped that Hodges's pleading guilty would accomplish the following: (1) gain credibility with the jury, (2) demonstrate Hodges's remorse, (3) limit the evidence presented to the jury, and (4) surprise the prosecution and thereby limit the effectiveness of its penalty case. The Tennessee Court of Criminal Appeals noted that although the goals of counsel were reasonable, Hodges "ultimately gained nothing by pleading guilty." *Hodges*, 2000 WL 1562865, at *20. For example, despite counsel's attempt to limit the evidence presented to the jury, a vast majority of what they hoped to keep out was allowed in. Trina Brown testified that Hodges planned to rob and kill the next person who propositioned him, and that he discussed how to carry out the crimes. She also told the jury that Hodges bound the victim's hands and feet and that, after she and Hodges ransacked the victim's apartment, Hodges strangled the victim, who was begging for his life. *Hodges*, 944 S.W.2d at 349. Police officers testified that the victim's belongings were found in Hodges's possession when he was arrested, that Hodges's fingerprints were found in the victim's home, and that Brown was photographed using the victim's ATM card. *Id.* at 350.

Defense counsel did successfully limit the prosecution's cross-examination of Hodges; the State was permitted to ask questions only about his personal history, and not about the circumstances of the offense. *Id.* at 350 n.6. However, the same result could have been achieved by putting on a reasonable doubt defense and having Hodges testify only during the sentencing hearing. This is also true of defense counsel's goals of gaining credibility with the jury and showing remorse.

Moreover, defense attorney Dawson testified in the state post-conviction proceeding that the defense team "never sat down and did an analysis of what are the benefits of going to trial, what are the deficits and where did that lead us." He also testified that when the defense team advised Hodges to plead guilty, he had "totally forgotten" about the third count of the indictment, aggravated robbery; a conviction on that count constituted an aggravating factor for purposes of the penalty phase.

However, trial counsel also acknowledged that the evidence of Hodges's guilt was overwhelming. As counsel explained during the state post-conviction proceeding, despite their advice that he should not speak with reporters, Hodges participated in a pre-trial television series in which he gave interviews "describing himself as a serial killer." Attorney Dawson described the difficulties that arose from representing such a client: "We had a client that was confessing to the public on eight murders. And he had written to the court; he had written to the prosecutor, a confession to the case that we had to try. It looked pretty dismal." Trial counsel summarized the evidence against Hodges: Hodges made inculpatory statements to police, prosecutors, the trial court, and television reporters; his fingerprints were at the scene of the crime; he had items from the victim's house with him when he was arrested; Trina Brown gave a statement implicating him; there were photos of Brown using the victim's bank card; and Brown's fingerprints were on the victim's card.

The defense team talked to Hodges about the decision to plead guilty and reviewed the guilty plea form with him. Hodges thanked his attorneys for their work and never complained about their representation.

If it were our task to determine whether trial counsel's performance was deficient because they advised Hodges to plead guilty, the decision would be a more difficult one. The ABA Guidelines at the time of the plea contemplated guilty pleas in capital cases *only* in exchange for a guarantee from the prosecution not to seek the death penalty. Here, no such exchange was made, and Hodges gained little—if anything—from his plea.

However, the "ABA Guidelines are not inexorable commands," *Post*, 621 F.3d at 418 (internal quotation marks omitted), and our task is *not* to determine whether trial counsel's performance was deficient. Rather, we must determine "whether there is *any reasonable argument* that counsel satisfied

*Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788 (emphasis added). And here, as identified by the Tennessee Court of Criminal Appeals, there is a reasonable argument that counsel satisfied *Strickland*'s deferential standard. Although not directly on point, the considerations in this case are similar to those faced by this court in *Post*: "[C]ounsel were between a rock and a hard place in determining the best way to spare [the defendant] a death sentence, given the overwhelming evidence of his guilt, [and] his numerous confessions." 621 F.3d at 418. And in *Post*, we found that counsel's actions were reasonable under a de novo standard of review, *id.*, which is far less stringent than the "doubly" deferential standard that we must apply here, *see Richter*, 131 S. Ct. at 788. Although there is some evidence that counsel here failed to appreciate fully the impact of their decision, that is not material to the issue before us: whether there is "any reasonable argument" that counsel's recommendation to plead guilty satisfies *Strickland*. As the Supreme Court has stated, "[C]ounsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade." *Nixon*, 543 U.S. at 192.

Ultimately, the state court that addressed this issue concluded that, "[a]lthough defense counsel's strategy for avoiding the death penalty was thwarted, the decision to pursue that particular strategy cannot be deemed incompetent." *Hodges*, 2000 WL 1562865, at *20. Under the doubly deferential standard imposed by § 2254(d) and *Strickland*, we simply cannot say that conclusion is contrary to or involves an unreasonable application of federal law.

### B.      Prejudice

Even if we did find that the state court's decision on trial counsel's performance was unreasonable, we could not grant relief because Hodges has failed to establish prejudice. As noted above, to show prejudice in the guilty-plea context, a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and instead would have insisted on going to trial." *Hill*, 474 U.S. at 59.

Because the state courts found that trial counsel's performance was not deficient, the state courts did not address the prejudice prong of the *Strickland* inquiry. We have previously held that where a state court addresses only the performance prong of the *Strickland* inquiry, this court will review the prejudice prong de novo. *See Morales v. Mitchell*, 507 F.3d 916, 935 (6th Cir. 2007). Despite the

Supreme Court's holding in *Richter* to the contrary, the Sixth Circuit has continued to review the prejudice prong de novo where, as here, the state court reviewed only the performance prong. *See Rayner v. Mills,* 685 F.3d 631, 636-639 (6th Cir. 2012).[5] Thus, we apply de novo review to the prejudice prong here.

In *Hill*, 474 U.S. at 59, the Supreme Court held that in the context of a challenge to a guilty plea, to establish prejudice a defendant need only show that "there is a reasonable probability that, but for the counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." The Court went on to give two examples. First, it noted that where the alleged error involves failure to investigate or discover exculpatory information, "the determination of whether the error 'prejudiced' the defendant . . . will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Id.* Second, it noted that where the alleged error involves a failure to advise the defendant of possible affirmative defenses, "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id.* It is therefore clear that

---

[5]In *Richter*, 131 S. Ct. at 784, the Supreme Court stated,

> Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. *This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim," not a component of one, has been adjudicated.*

(emphasis added). *Rayner* places undue emphasis on the "unaccompanied by an explanation" language of the first sentence's opening clause, but disregards entirely the second sentence, which requires that the habeas petitioner's burden of showing that there was no reasonable basis for the state court's denial of relief applies "whether or not the state court reveals which of the elements of a multipart claim it found insufficient. . . ." As the Court went on to say, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter* at 784–85. Whether the decision is accompanied by an explanation or not accompanied by an explanation, whether any provided explanation states which elements it found insufficient or not, the statute provides an unequivocal rule: "*§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated.*"

   *Rayner* also leaves this court with the following peculiar rule: if the state court fails to given an explanation as to *either* prong, then full AEDPA deference is due to both prongs; but if the state court gives an explanation of *one* prong, then we do not give deference to the other. In other words, the more information the state court provides, the less deference we grant it. This is contrary not only to the language of the statute, which speaks of "claims" not components of claims, but also contrary to the spirit of § 2254(d), which is designed to give *more* deference to a state court judgment on the merits.

   Moreover, as a matter of logic, a finding that counsel's performance was not deficient implicitly, but unequivocally, encompasses a finding that the performance did not prejudice the defendant. Indeed, it would be nonsensical to argue that a performance deemed to be constitutionally sufficient nevertheless prejudiced the defendant. It must be assumed that a state court's decision that performance was not deficient includes a decision that the performance was not prejudicial.

in determining whether a defendant has shown prejudice, a court must predict whether correction of the deficient performance might have enabled the defendant to succeed at trial. "[T]hese predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the idiosyncrasies of the particular decisionmaker." *Id*. at 59–60.

This court has previously noted that "testimony, though self-serving, may be enough by itself to satisfy the prejudice prong." *Miller v. Straub*, 299 F.3d 570, 581 (6th Cir. 2002). In *Miller*, the defendants testified at a hearing that they entered their guilty pleas with hesitation and would not have pled guilty but for counsel's advice. *Id*. The court also noted that one of the defendants presented, in the form of testimony from his trial counsel, "additional evidence that, with competent assistance, he would have pled not guilty." *Id*. at 582. Trial counsel testified that the defendant "pled guilty only reluctantly," and the court concluded that "the fact that [trial counsel] had to prevail upon [the defendant] to plead guilty tends to corroborate [the defendant's] testimony that he would have pled not guilty." *Id*. The court concluded that the defendants' "testimony, along with reasonable inferences from the facts and circumstances of this case," established prejudice under *Hill*. *Id*. at 583.

In Hodges's case, we cannot conclude that Hodges has established a reasonable probability that, but for counsel's advice, he would not have pled guilty. In fact, the only evidence concerning this issue appears in Hodges's Verified Amended Petition for Post Conviction Relief filed on March 24, 1998. There, notably, Hodges did not say that had he had better advice he would not have pled guilty. Rather, his statement was:

> Had trial counsel performed the above investigations and informed Petitioner of the result of those investigations, and had counsel timely communicated with Petitioner and given him the above advice, a reasonable probability exists that Petitioner would not have pleaded guilty to all counts in the indictment, but, rather, would have insisted on going to trial.

At the end of the document, Hodges's signature appears, verifying that the "foregoing allegations of fact are true and correct to the best of [his] information and belief."[6]

---

[6] We note that the verification oath and signature is required of all post-conviction petitions filed in Tennessee. *See* Tenn. Code Ann. § 40-30-204(e) (1997).

In contrast to the defendants in *Miller*, Hodges has never personally testified about his decision to plead guilty and whether he would have pled not guilty but for the advice of counsel. Moreover, unlike in *Miller*, where "reasonable inferences from the facts and circumstances" of the case suggested that the defendants would not have pled guilty but for advice of counsel, no such inferences exist here. To the contrary, any inferences that can be made make it clear that Hodges would have pled guilty regardless of what his counsel recommended. Leading up to trial, Hodges embraced his guilt. For instance, against the advice of counsel, he participated in a pre-trial television series in which he gave interviews "describing himself as a serial killer." Hodges also implicated himself in letters to the court and prosecutor. Those simply are not the actions of a defendant hoping to avoid a guilty plea, nor do they help establish a reasonable probability that Hodges would have pled not guilty if so advised by counsel.

Furthermore, *Hill* instructs us to examine how competent counsel might have influenced the outcome of a hypothetical trial, *see* 474 U.S. at 59–60, and there is virtually no chance that Hodges could have avoided convictions by proceeding to trial. As has been discussed repeatedly, the evidence against Hodges was overwhelming, and he only made the situation worse by corresponding with reporters, the court, and the prosecutor against the advice of his counsel. Similarly, we have no evidence or reason to believe that the penalty phase of trial would have proceeded differently had there first been a full guilt phase.

A self-serving statement, couched in exactly the terms of the Supreme Court's standard, and filed as a required part of Hodges's verified petition for post-conviction relief, cannot establish a reasonable probability that Hodges would have pled not guilty but for the advice of counsel, where all objective evidence points unequivocally to the contrary. Hodges is not entitled to relief on his claim of ineffective assistance of counsel at the plea phase.

## IV.     Ineffective Assistance of Counsel at Sentencing Phase & Incompetency at Trial

Hodges argues that the district court erred when it denied him an evidentiary hearing on his claims that he was incompetent at trial and that his trial counsel were ineffective at sentencing. He also

argues that the district court erred when it denied his competency and ineffective assistance of counsel claims on the merits.

Hodges failed to present his claim of incompetency at trial to the state courts, and he no longer has any state court remedies to exhaust. *See Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997) (citing Tenn. Code Ann. § 40-30-217(a) (1996 Supp.)). The claim is therefore procedurally defaulted.

Hodges argues that substantive competency claims cannot be procedurally defaulted, citing cases from the Tenth and Eleventh Circuits. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005); *Walker v. Gibson*, 228 F.3d 1217, 1229 (10th Cir. 2000); *Adams v. Wainwright*, 764 F.2d 1356, 1359 (11th Cir. 1985). However, neither the Supreme Court nor this court has adopted such a rule, and we decline to do so here. As the Ninth Circuit noted in *LaFlamme v. Hubbard*, No. 97-16973, 2000 WL 757525, at *2 (9th Cir. Mar. 16, 2000), those courts that have held that substantive competency claims cannot be procedurally defaulted appear to have conflated the distinct concepts of waiver and procedural default. Although it is true that substantive competency claims cannot be waived, *Pate v. Robinson*, 383 U.S. 375, 384 (1966) ("it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial"), they can be procedurally defaulted. We agree with the Ninth Circuit that, "unlike waiver, the procedural default rule does not rely on the petitioner's voluntary abandonment of a known right, but only on the fact that the claim was rejected by the state court on independent and adequate state grounds." *LaFlamme*, 2000 WL 757525, at *2 (internal quotation marks and formatting omitted). We hereby hold that substantive competency claims are subject to the same rules of procedural default as all other claims that may be presented on habeas.

Hodges also cannot rely on ineffective assistance of post-conviction counsel to excuse the default. Hodges did not default an ineffective assistance of trial counsel claim; he defaulted his claim that he was not competent to stand trial. Accordingly, *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) are inapplicable and the *Coleman* rule still applies. Because Hodges has not presented any evidence to justify review of his claim in order to prevent a fundamental

miscarriage of justice, *see Carrier*, 477 U.S. at 495–96, the substantive competency claim is barred, and we will review the ineffective assistance claim only to the extent that it concerns failure to investigate and present additional mitigating evidence.

In his state post-conviction petition, Hodges claimed that trial counsel were ineffective for failing to investigate and present additional mitigating evidence. According to Hodges, his counsel should have obtained prison records that showed he told a doctor that he was raped as a boy and should have interviewed additional people who were familiar with his background. Hodges also asserted that trial counsel failed to investigate evidence concerning the causes, effects, and treatment of substance abuse; failed to adequately prepare him for his testimony; and failed to make effective use of experts. Hodges requested, and the trial court granted, $15,000 for mitigation investigation; but the trial court denied Hodges's request for additional funds to hire a drug and alcohol specialist, a mitigation specialist, and a fingerprint expert. At the evidentiary hearing, the trial court heard testimony from Hodges's trial counsel, a clinical sociologist who helped prepare Hodges's mitigation case, the Tennessee District Public Defender's Conference chief counsel, and a mitigation specialist retained for the post-conviction proceeding. *Hodges*, 2000 WL 1562865, at *4–*12. The trial court denied Hodges's petition.

The appellate court affirmed, finding that Hodges had not presented any evidence in post-conviction proceedings that was substantially different from the proof introduced at the penalty phase. *Id.* at *27. The court found that the experts presented at the penalty phase, with one exception, were in possession of the same records about Hodges used by the post-conviction mitigation specialist, and that additional evidence from further mitigation investigation would have been cumulative to the evidence obtained by trial counsel before sentencing. *Id.* It stated, "[g]iven the records presently before this court, we conclude that trial counsel adequately investigated the appellant's background and presented a case in mitigation that was supported by the information introduced." *Id.* The appellate court also held that the trial court did not abuse its discretion by denying Hodges the additional funds he requested because his post-conviction counsel were capable of presenting the available mitigation information without expert assistance. *Id.* at *29.

## A.    Evidentiary Hearing

"This court reviews a district court's decision whether to hold an evidentiary hearing for an abuse of discretion." *Vroman v. Brigano*, 346 F.3d 598, 606 (6th Cir. 2003).

Generally, 28 U.S.C. § 2254(e)(2) governs whether a district court should hold an evidentiary hearing in a habeas proceeding. Section 2254(e)(2) states that, with a few exceptions, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim." Hodges does not argue that one of the exceptions applies; instead, he argues that he did not fail to develop the factual basis of his claim and is therefore entitled to an evidentiary hearing.

We need not decide whether Hodges developed the factual basis of his claim in state court because the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), prohibits us from considering new evidence in this case. The Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 1398. It reasoned that the language of the statute is "backward-looking" and "requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court." *Id*. The Court also noted that its holding did not "render[] § 2254(e)(2) superfluous" because it "continues to have force where § 2254(d)(1) does not bar federal habeas relief." *Id*. at 1400–01.

Hodges's ineffective assistance claim was brought under § 2254(d)(1), and it was adjudicated on the merits by the state courts. *Pinholster* therefore applies. It was a reasonable exercise of the district court's discretion to deny an evidentiary hearing on the claim, because any evidence introduced would be "irrelevant" and "have no bearing on § 2254(d)(1) review" in any event. *See id*. at 1400.

## B.    Ineffective Assistance

To prevail on his claim of ineffective assistance of counsel at sentencing, Hodges must show both that his counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. With respect to performance, "counsel should be strongly

presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 131 S. Ct. at 1403. An attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003). However, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id*. at 533. The court must consider not only the evidence known to counsel, but also whether that evidence "would lead a reasonable attorney to investigate further." *Id*. at 527. "[I]f a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation, the presumption of reasonableness imposed by *Strickland* will be hard to overcome." *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001) (internal quotation marks omitted). "[T]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker." *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (quoting *Strickland*, 466 U.S. at 700).

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id*. (internal quotation marks and citations omitted). Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

The state court record supports the conclusion that Hodges's trial counsel reasonably investigated Hodges's background and presented mitigating evidence. The Tennessee Supreme Court summarized the mitigation evidence presented at sentencing as follows:

> In mitigation, the defendant testified and also presented the testimony of his mother, his brothers and Dr. Barry Nurcombe, a child psychiatrist. This proof showed that the defendant was the next to youngest of his mother's five sons. His mother and father were not married. His father was actually married to another woman, but engaged in what one of the witnesses described as an "irregular union" with the defendant's mother for eighteen years. The defendant's father abused the defendant's mother and was strict with the defendant's brothers, three of whom were the children of another man. The defendant, however, was his father's favorite and was spoiled. Financial difficulties

forced the family to move about frequently, and defendant's father supported the family only sporadically.

The defense introduced proof to show that Hodges seemed normal until he was twelve years old. At that time, he began to associate with older boys, sniff glue and gasoline, be truant from school, and run away from home. He also engaged in sexual activities with his younger brother and attempted sexual activities with a female cousin. He became involved with the juvenile authorities and was confined to a juvenile facility in Chattanooga.

Through his mitigation proof, the defendant attempted to establish that a catalyst and major contributing cause of his delinquent and later criminal behavior was his rape and sexual abuse by a stranger when he was twelve years old. According to the defendant, he accepted a stranger's offer of a ride home when he was playing a short distance from his home on Fessler's Lane in Nashville. Rather than driving Hodges home, the stranger drove Hodges to his home and raped him. Fearing rejection by his homophobic father and driven by guilt, the defendant told no one of this incident until he was arrested in 1990.

Dr. Nurcombe testified that, while the defendant suffered from an antisocial personality disorder, low self-esteem, and substance (marijuana) abuse, the killing was motivated by a subconscious desire for revenge for the sexual abuse inflicted on him when he was twelve, coupled with Hodges' fear that his family might discover that he was engaged in homosexual prostitution since Brown had told Hodge's [sic] sister-in-law shortly before the killing that he was a homosexual prostitute. The defense also introduced testimony that Brown dominated and manipulated the defendant.

In rebuttal the State called Dr. James Kyser, a forensic psychiatrist, and Dr. Leonard Morgan, a clinical psychologist. Both had examined the defendant and concluded that he suffered from an antisocial personality disorder. They described persons with this disorder as having "no conscience," being "self centered," being "notoriously dishonest and untruthful," and having "very little regard for the feelings of others and . . . willing to use any means to get what they want, no matter who it hurts." While acknowledging the complicated factors involved in antisocial personality disorders, the State's experts discounted the singular importance of the one incident of alleged sexual abuse in causing the defendant's actions. Dr. Morgan concluded that the defendant "was in complete control of his behavior" and not suffering from mental illness or emotional disturbance.

*Hodges*, 944 S.W.2d at 350–51. Because Hodges alleges that his trial counsel's mitigation case overlooked significant aspects of his background, the mitigation testimony merits more detailed attention.

Dr. Nurcombe, head of child psychiatry at Vanderbilt Medical School, testified that he specialized in juvenile delinquency and the effects of sexual abuse, and that he had examined at least 500 children. To assess Hodges, Dr. Nurcombe reviewed his school records, legal records, mental health records, and the results of an investigation by a private investigation group concerning his family background. He also interviewed Hodges for a total of nine hours on three occasions, and had a one-hour phone interview with him. The mental health records available to Dr. Nurcombe included five psychological tests from the age of twelve to late adolescence. He found no evidence that Hodges was insane, but he did say that Hodges was not mentally healthy. He also said that Hodges suffered from an antisocial personality disorder, low self-esteem, and substance abuse.

In addition to Dr. Nurcombe, Hodges's counsel presented six other witnesses at sentencing: Hodges's mother, three of his brothers, a neighbor, and Hodges himself. The testimony generally showed that Hodges had a difficult childhood in a low-income, dysfunctional family and that his behavior significantly worsened at the age of twelve, around the time he claims to have been raped. However, Hodges himself admitted that his parents treated him well, and that his mother took him for mental health treatment many times.

At the state post-conviction proceeding, Hodges presented additional testimony. He presented the testimony of his trial counsel, each of whom explained that they did not sufficiently prepare for the sentencing phase of trial. He also presented the evidence of Dr. Ann Charvet, a clinical sociologist, who explained that she did not think the mitigation information she had compiled was used properly by the defense team, but was unable to suggest any specific information that Dr. Nurcombe or other witnesses failed to present to the jury. He presented the testimony of David Keefe, chief counsel of the Tennessee District Public Defender's Conference, who had reviewed Hodges's counsel's representation and concluded that it was deficient. *Hodges*, 2000 WL 1562865, at *10. And he presented the evidence of mitigation specialist Julie Hackenmiller, who holds a masters degree in forensic psychology. She discussed mitigation themes that were not developed at trial.

Although the evidence presented at the post-conviction proceeding shows that trial counsel's performance was not perfect, in light of the substantial and competent evidence produced at the penalty

phase of Hodges's trial, Hodges has not shown that the Tennessee state court's decision that trial counsel's performance was not deficient was unreasonable. The burden of proof is on Hodges, *Pinholster*, 131 S. Ct. at 1398, and under the "doubly deferential" standards imposed by § 2254(d) and *Strickland*, *id*. at 1403, Hodges has not carried that burden. Here, Hodges's counsel retained a mitigation specialist and several experts. Defense counsel obtained most of Hodges's available school, medical, and juvenile records. Dr. Nurcombe used those records and his interviews with Hodges to diagnose him, testify at length about his background, and link his homosexual rape at age twelve and his exposure as a homosexual prostitute to his crime. The testimony of Hodges's family members was consistent with Dr. Nurcombe's testimony and conclusions. And in post-conviction proceedings, Hodges identified little information not considered by Dr. Nurcombe.

The circumstances of this case are similar to those considered by the Supreme Court in *Bobby v. Van Hook*, 130 S. Ct. 13 (2009). There, the petitioner claimed that his counsel were ineffective because their mitigation investigation was insufficient. *Id*. at 18. The Supreme Court disagreed, finding that although the petitioner was tried less than three months after his indictment, trial counsel spoke with his parents, an aunt, and a family friend; consulted with two expert witnesses; contacted the Veterans Administration and sought medical records; and enlisted a mitigation specialist. *Id*. Trial counsel also presented evidence that the petitioner began drinking and using drugs as a child, witnessed his father abuse his mother, had violent fantasies, attempted suicide five times, suffered from borderline personality disorder, consumed drugs and alcohol on the day of the crime, and may have been motivated by a "homosexual panic." *Id*. at 18–19. The Supreme Court rejected the petitioner's argument that his counsel could have found more mitigating evidence by interviewing other members of his extended family and a psychiatrist who once treated his mother:

> [T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and search for it distractive from more important duties. . . . [I]t was not unreasonable for [the petitioner's] counsel not to identify and interview every other living family member or every therapist who once treated his parents.

*Id*. at 19.

Here, given the mitigation evidence Hodges's counsel gathered from his family and Dr. Nurcombe's review of his background, it was reasonable for counsel not to identify and interview more distant family members or review their mental health. And to the extent that Hodges argues that counsel were ineffective for relying on Dr. Nurcombe, *see* Pet.'s Br. at 15 (describing Nurcombe as "a Court TV pundant [sic]"), 112 (Nurcombe "fail[ed] to conduct the sort of thorough personal history that is necessary to come to an accurate diagnosis"), his argument fails because Hodges has not shown that trial counsel had good reason to believe Dr. Nurcombe was incompetent, or, for that matter, that he was incompetent.[7] *See Fautenberry v. Mitchell*, 515 F.3d 614, 625 (6th Cir. 2008) ("[The petitioner] has not shown that counsel had good reason to believe that [the expert] was incompetent, and we conclude that it was objectively reasonable for counsel to rely upon the doctor's opinions and conclusions." (internal quotation marks omitted)); *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006) (counsel's reliance on mental health experts was reasonable because petitioner presented no evidence that they were not competent); *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005) (counsel reasonably relied on the opinions of a psychologist and psychiatrist in not seeking additional testing).

Where, as here, trial counsel puts on a reasonable mitigation case and presents nearly all of the same information as presented by the petitioner's post-conviction experts, we cannot find deficient performance. And we certainly cannot find that the state court's decision that trial counsels' performance was not deficient was unreasonable. "As *Strickland* made clear, our role on habeas review is not to nitpick gratuitously counsel's performance. After all, the constitutional right at issue here is ultimately the right to a fair trial, not to perfect representation." *Smith v. Mitchell*, 348 F.3d 177, 206 (6th Cir. 2003) (citing *Strickland*, 466 U.S. at 684).

Because we find that trial counsel's performance was not deficient, we need not address whether Hodges was prejudiced by that performance. Hodges is not entitled to habeas relief on this claim.

---

[7]Indeed, we believe that the record shows that Dr. Nurcombe's theory and testimony were competent.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Hodges's petition for habeas relief.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. Because I conclude that the Tennessee courts unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), I respectfully dissent from Part III of the majority opinion.

### A. Performance

The Supreme Court has explicitly approved using ABA Guidelines on attorney performance in effect at the time of a defendant's trial as "guides to determining what is reasonable" performance by counsel. *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1482 (2010); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *see also Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam). "ABA Guidelines are not 'inexorable commands'; rather, they are 'only guides to what reasonableness means, not its definition.'" *Post v. Bradshaw*, 621 F.3d 406, 418 (6th Cir. 2010) (quoting *Bobby*, 130 S. Ct. at 17) (some internal quotation marks omitted)). As discussed by the majority, the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,[1] which were in effect at the time of Hodges's 1992 trial, disapprove entering a guilty plea in a capital case without the prosecution's agreement not to seek the death penalty in exchange for the guilty plea. The Guidelines state that "[i]t is suggested that [pleading a client guilty and then putting on a contested penalty hearing] is an effective strategy *only* when the attorney *knows without any doubt* that no death sentence will result. Any other 'strategy' for entering a guilty plea is ill-advised and should be abandoned." ABA Guidelines § 11.6.2 cmt. n.2 ) (emphasis in original) (quoting Dept. of Public Advocacy, KENTUCKY PUBLIC ADVOCATE DEATH PENALTY MANUAL, 328–33 (1983)). Further, "[i]f no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights." *Id.*

---

[1] ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), available at: http://www.americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocuments/1989Guidelines.authcheckdam.pdf

§ 11.6.3 cmt.; *see also id.* § 11.6.2 cmt. ("Counsel should insist that no plea to an offense for which the death penalty can be imposed will be considered without a written guarantee, binding on the court or other final sentencer, that death will not be imposed.").

"[I]n a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed." *Florida v. Nixon*, 543 U.S. 175, 192 (2004). Donald Dawson, one of Hodges's trial attorneys, testified in the post-conviction proceeding in state trial court that the decision to have Hodges plead guilty was made during the weekend prior to trial when the attorneys "sat down and pretty much saw the guilt-innocence phase as hopeless." J.A. at 1745. The attorneys were "trying to figure out what was the way to limit the jurors['] bad feelings about us [a]nd [we] thought that by pleading guilty, we could give the defense some credibility." *Id.* at 1746; *see also id.* ("[W]e [thought we] could get the jury to sort of be thankful to us that we didn't make them sit through a guilt-innocence phase and we wouldn't lose our own credibility by arguing the guilt or innocence and we would have a better chance to get a life verdict.").

On its face, this appears to be the sort of strategic trial decision owed deference under *Strickland*. However, Dawson also testified that the defense team did "[n]ot adequately" think through the decision to plead guilty: "we never sat down and did an analysis of what are the benefits of going to trial, what are the deficits and where did that lead us." *Id.* Dawson testified that at the time of trial, the defense team had not read available literature setting out standards for adequate representation in capital cases. *Id.* at 1747. In particular, the attorneys were unfamiliar with "the advantages of putting [on] a defense [in the guilt phase] consistent with your mitigation theory." *Id.* They also failed to appreciate the advantages of "hav[ing] the jury . . . have a chance to look at your client longer and find him guilty[,] [a]nd then decide [']now that we find him guilty, let's see . . . [w]hat is the proper sentencing[']." This would allow the jury to not view the penalty phase as its only opportunity to pass judgment on the defendant's actions. *Id.* at 1748; *see also id.* at 1841–43 (post-conviction hearing testimony of Michael Terry). The attorneys conducted no legal research into proper considerations in deciding whether to plead guilty, and did not weigh the possible benefits of putting on a case at the guilt phase of trial. *Id.* at 1748–1751; *see also id.* at 1839 (testimony of Michael Terry).

Dawson also testified that nearly all of the evidence that he and the other attorneys hoped to keep out by pleading guilty came in anyway at the sentencing phase, as should have been clear from an analysis of Tennessee law. *Id.* at 1752–53. Finally, Dawson stated that when he advised Hodges to plead guilty, the attorneys had "totally forgotten" about the third count of the indictment, aggravated robbery, a conviction of which constituted an aggravating factor for purposes of the penalty phase. *Id.* at 1756–57. In fact, Dawson did not "recall having talked to Mr. Hodges at all about pleading to the robbery." *Id.* at 1757. Both Dawson and co-trial-counsel Michael Terry stated that pleading guilty was a mistake. *Id.* at 1755, 1762–63, 1842. Terry stated that he "would not plead a capital defendant guilty again in any case." *Id.* at 1842.

Additionally, in the post-conviction hearing, the court heard testimony from David Keefe, chief counsel for the capital division of the Tennessee District Public Defender's Conference, who examined the conduct of Hodges's trial counsel at the request of Hodges's post-conviction attorneys. Keefe testified that he "believed the decision to plead guilty was wrong and hastily made. He opined that, by pleading guilty, the defense team confused the jury and lost an array of appellate issues." *Hodges*, 2000 WL 1562865, at *10. Thus, although the decision to plead guilty was indeed a "strategic" decision designed to curry favor with the jury and limit the prosecution's presentation of evidence, it was not intelligently made based on a weighing of the advantages and disadvantages of going to trial in the guilt phase, and was made without reference to secondary authorities providing standards for representation in death penalty cases. Further, the strategy was ill-designed to achieve one of its primary aims: limiting presentation of damaging evidence about the crime. Therefore, advising Hodges to plead guilty was inconsistent with the prevailing standard of competent representation in death penalty cases.

*Post v. Bradshaw*, 621 F.3d 406 (6th Cir. 2010), discussed by the majority, is distinguishable. In *Post*, the defendant "refused to plead guilty, despite the State's offer of a life sentence in return for a guilty plea." *Id.* at 417. The case addressed the question whether the decision to enter a no-contest plea and to submit the penalty phase to a three-judge panel rather than a jury was objectively reasonable. The court concluded that the defendant's weak mitigation evidence made the attorneys' decision to forgo the right to a penalty-phase jury reasonable. *Id.* The *Post* court thus stated that "Post's counsel were between a rock and a hard place in determining the best way to spare him a death sentence, given

the overwhelming evidence of his guilt, his numerous confessions, and his refusal to plead guilty." *Id.* at 418. Although these considerations are similar to those facing Hodges's attorneys, the *Post* decision does not suggest that defense counsel failed to appreciate the import of their decision. Indeed, the opinion indicates that counsel weighed the pros and cons of pleading no contest and putting the case before a three-judge panel instead of a jury. *Id.* Further, part of the rationale advanced by the *Post* court in justifying counsel's decision was that "[b]y pleading no contest, [Post] would 'avoid[ ] the ordeal' of a guilt phase and have his sentence 'determined *without the sentencing court hearing all of the adverse testimony that would be produced at trial.*'" *Id.* at 417 (quoting ABA Standards for Criminal Justice 4–6.1 cmt. (2d ed. 1980) ("The Defense Function") (emphasis and third bracket added by *Post*)). Although Hodges's defense team intended their decision to plead guilty to have the same effect, in reality nearly all of the testimony that would have been introduced at trial was introduced during the penalty phase. The miscalculation was not a matter of a sound decision turning out to be a mistake in hindsight. Rather, the decision had no legal support and was clearly a mistake in the first place. Hodges's attorneys *hoped* that pleading guilty would be a beneficial strategy, but had little sound reasoning behind this belief. *See Post*, 621 F.3d at 428 (Cole, J., dissenting) ("I believe that the Constitution requires attorneys to make strategic judgments based on something more concrete than unsubstantiated hope, especially when their client's life hangs in the balance.").

*Nixon* is also distinguishable. In *Nixon*, defense counsel was faced with overwhelming evidence of Nixon's guilt. After a failed attempt to negotiate a guilty plea in exchange for the prosecutor dropping the death penalty, defense counsel "concluded that the best strategy would be to concede guilt, thereby preserving his credibility in urging leniency during the penalty phase." *Nixon*, 543 U.S. at 181. Instead of advising his client to enter a guilty plea, however, defense counsel decided to proceed to the guilt phase of trial, but to concede Nixon's guilt to the jury. In opening statement, defense counsel "acknowledged Nixon's guilt and urged the jury to focus on the penalty phase." *Id.* at 182. The prosecution introduced extensive evidence of Nixon's guilt during the guilt phase. Defense counsel "cross-examined [the prosecution's] witnesses only when he felt their statements needed clarification, . . . and he did not present a defense case." *Id.* at 183. He also objected to some evidence as unduly prejudicial. "In his closing argument, [defense counsel] again conceded Nixon's guilt, and reminded

the jury of the importance of the penalty phase." *Id.* (internal citation omitted). The jury found Nixon guilty, and the case proceeded to the penalty phase, at which defense counsel presented testimony of a number of witnesses. *Id.* at 183–84. Importantly, "[t]he State presented little evidence during the penalty phase, simply incorporating its guilt-phase evidence by reference." *Id.* at 184.

The *Nixon* Court did not address the issue presented here. In fact, counsel in *Nixon* did exactly what Hodges's counsel now concede they should have done. In approving of Nixon's attorney's strategic decision, the Court discussed the downside to pleading guilty in lieu of going to trial at the guilt phase:

> As [defense counsel] determined here, pleading guilty without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.2, Commentary (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1045 (2003) ("If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights."). Pleading guilty not only relinquishes trial rights, it increases the likelihood that the State will introduce aggressive evidence of guilt during the sentencing phase, so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence. *See* [Gary] Goodpaster, [*The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*], 58 N.Y.U. L. Rev. 299, 331[,] 558–59, 560–61 [(1983)].

543 U.S. at 191 n.6 (citation altered). Had Hodges's counsel acted as Nixon's did by proceeding to trial and acknowledging guilt rather than pleading guilty, there would have been no constitutionally deficient performance.

Addressing Hodges's *Strickland* claim, the Tennessee Court of Criminal Appeals reasoned:

> Although it is true that the appellant ultimately gained nothing by pleading guilty, the record persuasively demonstrates that the appellant had little to gain by insisting upon a trial. It is undisputed that the evidence against the appellant was overwhelming and that his chances of acquittal were virtually non-existent. Indeed, in advising the appellant, defense counsel was faced with two options: plead not guilty to the indictment and face a full trial; or plead guilty to the indictment and face limited evidence in a sentencing hearing with an opportunity to trade on his acceptance of his guilt and remorse. Confronted with the overwhelming evidence of the appellant's guilt, defense counsel advised the appellant to plead guilty in the reasonable hope of obtaining leniency

during the sentencing phase. Defense counsel reasonably believed that the jury would view the appellant's guilty plea as an expression of remorse warranting a less severe sentence than that imposed upon a defendant who protests his innocence in the face of overwhelming evidence of guilt. Moreover, by pleading guilty, the appellant eliminated the presentation to the jury of all of the evidence available to establish the appellant's guilt of the murder. The hard callous facts behind the offenses, in essence, were desensitized by avoiding the guilt phase. The absence of an in-depth recitation of facts enabled the appellant to seek some sympathy from the jury in the face of mitigating evidence.

*Hodges v. State*, 2000 WL 1562865, at *20 (Tenn. Crim. App. 2000). The court reasonably pointed to Hodges's counsels' "hope of obtaining leniency during the sentencing phase" as a legitimate justification for pleading guilty. *Id.* However, the other reasons advanced in support of counsels' decision lack support in the record. Most of the evidence of the circumstances of the murder was allowed in the penalty phase, and the "hard callous facts behind the offense" were not "desensitized by avoiding the guilt phase." Rather, those newly-presented facts were fresh in jurors' minds when they deliberated over imposition of the death penalty. As Gary Goodpaster observed:

> [G]oing through a guilt phase trial helps to segregate and distance from the sentencer the prosecution's strongest case against the defendant. Were defendant simply to admit guilt and go straight to the penalty phase trial, the prosecution at that time would undoubtedly present much of what it otherwise would have presented during the guilt phase.

Goodpaster, 58 N.Y.U. L. Rev. at 331. Hodges's counsel did not consider the ramifications of pleading guilty rather than proceeding to the guilt phase of the trial. Much of the evidence they hoped to exclude was admissible under Tennessee law. Counsel admitted forgetting about the aggravated robbery charge, itself an aggravating factor once Hodges pleaded guilty. Although I am mindful of the deference due to the state court under AEDPA, I must conclude that the decision that counsel met minimum constitutional standards involved an unreasonable application of clearly established federal law.

**B. Prejudice**

In order to demonstrate prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).[2]

The majority is correct that Hodges himself has never stated that, but for his counsel's deficient advice, he would not have pleaded guilty and would have insisted on going to trial. Additionally, Hodges's habeas petition alleged that counsel's advice to plead guilty constituted ineffective assistance, but did not specifically state that, had counsel advised him otherwise, he would not have pleaded guilty. Hodges's brief on appeal states simply that "where Mr. Hodges had nothing to gain by pleading guilty, he certainly would not have entered a guilty plea if his lawyers had given him accurate information – in fact, had Mr. Hodges's lawyers done their research, they wouldn't have advised Mr. Hodges to plead guilty at all." (Opening Br. of Appellant 83.) However, this is not the typical guilty plea case.

As the majority correctly notes, Hodges was not protesting his innocence leading up to trial. Rather, he had admitted his guilt in one or more television interviews and in letters to the prosecution and the trial court (against the advice of counsel). *See* J.A. at 1704, 1786 (testimony of Donald Dawson). This certainly suggests that Hodges was ready to plead guilty, and that he would have been convicted had he pleaded not guilty. That, however, does not settle the issue. The issue here is not whether counsel were competent in their assessment and advice regarding the likelihood of conviction at trial, but rather in advising that there were significant benefits to forgoing trial. *See Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003) (noting that it is "easier to show prejudice in the guilty plea

---

[2]I do not join in the majority's characterization of *Rayner v. Mills*, 685 F.3d 631 (6th Cir. 2012), as contrary to the Supreme Court's holding in *Harrington v. Richter*, 131 S. Ct. 770 (2011). The majority does not address *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005), which *Richter* did not purport to overrule. In *Wiggins*, the Supreme Court stated that its "review [was] not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis." *Wiggins*, 539 U.S. at 534; *see Rompilla*, 545 U.S. at 390 ("Because the state courts found the representation adequate, they never reached the issue of prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*[.]"). Although there is obvious tension between *Wiggins*, *Rompilla*, and *Richter*, the panel's opinion in *Rayner* resolved this tension, *see Rayner*, 685 F.3d 638–39, and its decision is consistent with decisions of our sister circuits. *See Ferrell v. Hall*, 640 F.3d 1199, 1224 (11th Cir. 2011); *Sussman v. Jenkins*, 642 F.3d 532, 533–34 (7th Cir. 2011) (Ripple, J., in chambers).

context" than in other contexts "because the claimant need only show a reasonable probability that he would have pleaded differently").

In *Hill*, the Court stated that "where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." 474 U.S. at 59. Hodges's claim here is not that counsel failed to investigate or discover potentially exculpatory evidence that would have led him to change his plea, so this language from *Hill* is not squarely on point. Hodges's claim is, however, that counsel failed to adequately consider the benefits of going to trial, and based their decision to advise him to plead guilty on an erroneous understanding of the consequences of a guilty plea at sentencing and insufficient legal research and investigation into the proper conduct of a capital case. This parallels the reasoning of *Hill*. Hodges's two primary trial attorneys both testified that had they been aware of the proper standards for death penalty representation and had they accurately considered the drawbacks to pleading guilty, they would have advised Hodges to go to trial. J.A. at 1755, 1842. Thus, there is compelling evidence that counsel would have "changed [their] recommendation as to the plea." *Hill*, 474 U.S. at 59.

The ultimate question under *Strickland* and *Hill* is whether the defendant has "established the *reasonable probability* that he would not have entered his plea but for his counsel's deficiency." *Premo v. Moore*, 131 S. Ct. 733, 744 (2011) (emphasis added). Although Hodges has not stated under oath that he would not have pleaded guilty if his counsel had advised against it, counsel's testimony that they would have advised him against pleading guilty establishes the requisite "reasonable probability" of a different outcome. This is not a case where the decision to plead guilty or not guilty was based on the likelihood of conviction versus acquittal. Rather, the choice was made on the likely effect of the choice on the outcome of the penalty phase, and it is clear that counsel's advice in this regard was constitutionally ineffective. Had Hodges's counsel advised him to plead not guilty, there is no reason to think he would not have heeded their advice. His conduct during the penalty phase, including taking the stand to provide testimony about his background in order to establish mitigating factors, demonstrates that he preferred a sentence of life imprisonment over death. Had his counsel informed

him that the better strategy for achieving this outcome was to plead not guilty and go to trial in the guilt phase, there is more than a reasonable probability that Hodges would have taken their advice.

In sum, although the Supreme Court recently cautioned that "hindsight cannot suffice for relief when counsel's choices [to advise the defendant to plead guilty] were reasonable and legitimate based on predictions of how the trial would proceed," and that "[t]here is a most substantial burden on the claimant to show ineffective assistance" in that situation, *Premo*, 131 S. Ct. at 745, counsels' choices here were based on unreasonable predictions about how the penalty phase would proceed, particularly about how pleading guilty would affect the prosecution's ability to present damaging evidence about the details of the crime, and a complete failure to consider the benefits of going through the guilt phase. Further, Hodges has made an adequate showing of prejudice.

Because I conclude that the state court unreasonably applied *Strickland*, I respectfully dissent from Part III of the majority's opinion and would grant Hodges's petition for habeas corpus on this issue.